The last case is 2009-3156, Denson v. Veterans Administration. Mr. Nichols, whenever you're ready. You're reserved five minutes. Yes, Your Honor. May it please the Court? Go ahead. I'm George C. Nichols, and I'm here on behalf of the petitioner, Kimberly Denson. And as opposite to the cases before us, I'm not jurisdictional. I think ours is a little more straightforward. And we also have a very difficult standard. And I agree with the responding agency that the court does not disturb a penalty choice within the agency's discretion unless the severity of the agency's action appears to be totally unwarranted. And here we actually have two standards kind of stacked on top of one another because we have to go back to the reasonableness standard that the administrative legal judge at the Merit Persistence Detection Board level has when he has to determine if the penalty, based on the facts and everything, was reasonable, and then to this level where we have to show that you, on top of the reasonableness, it was completely arbitrary for the Merit Persistence Detection Board to turn down the finding that it was reasonable to terminate my client for her actions that make up the bulk of this case. And we also agree that the penalty choice that was here in its termination is one of the penalties allotted under the charges and under the rules of her employment. It's one of those she was charged with inappropriate conduct, and the standard in the penalty range is very wide for inappropriate conduct. However, were we to... But if they've considered all of the deadless factors of making a determination, is it within the discretion of the agency to make the final determination? Yes, Your Honor. They have broad discretion. They do have broad discretion, Your Honor. We would have to reverse them on the abuse of discretion, their discretion. Where do they abuse it in this particular situation? Well, Your Honor, I would point back to the administrative legal judge's opinion, where he actually states, give me just a second, in his final paragraph, his two reasons for upholding the termination was first, he says, the deciding official considered the mitigating circumstances but found them outweighed by the nature and seriousness of the offense. And secondly, he says, in the deciding official's view, she lacked remorse. Well, if you actually read the deciding official's transcript, he says, and this is on his transcript, page 33, lines 16 through 19, yes, you know, I think there is remorse. And so, you know, we see here where the administrative judge was incorrect in citing back to the testimony of the deciding official. And we'd also go back to the deciding official himself and say that he, if you look at all the Douglas factors involved in this case, the overwhelming majority were actually in Ms. Denson's favor. We showed that she has a great chance of rehabilitation. She had mitigating circumstances, such as the family not wanting to see her terminated, and they testified at the hearing that they did not want to see her terminated. And, you know, they also, you know, this is agreed by stipulation, that the actions failed to bring any kind of bad press or notoriety against the agency. And there was not a similar case involving social workers. It didn't lead to an outbreak of this type of action. And the only prior discipline on record was a non-patient-related action, and the deciding official himself said was not, you know, did not weigh for or against her in this factor. She also has a non-supervisory role. And, you know, it was agreed that her actions were not malicious or intending to hurt the veteran in any way. All of that's true, counsel, but we've had cases in which the only significant factor was that the agency, the immediate supervisors had lost confidence in that employee's honesty or integrity or whatever. And we've had, we found it very difficult to second guess those agency determinations when the agency says, look, you know, nice person, good record, but we've lost confidence in that individual, and we can't put that individual back into a similar job. What do we do then? Well, if you actually look at some of the cases here, like when I would point to it would be Walsh v. Department of Veterans Affairs, and that is 62 Merit System Protection Reporter 586. In that case, and it's an older case, it's from 1994, the agency actually, here the agency terminated the employee, the administrative legal judge remanded it, the agency appealed, and the court actually found that contrary to the administrative judge's findings, the agency did prove, and this is where it's beyond the actions of my client, that the appellant had an intimate sexual relationship with the patient and that he was quiet at the medical center and it lasted for 18 months. It's completely opposite of my case where it's been stipulated there was no sexual relationship, no sexual conduct happened, and they never had any kind of conduct or relationship off the premises. They never met off the premises of the hospital. But what I was pointing to in that case, in that particular case, the Merit System Protection Board actually found that the penalty did not merit removal, although, and I will quote from this, despite the seriousness of the appellant's misconduct, she has over 17 years of service with the agency, and at least the last year of which was rated at a highly successful level. Thus, we find that a 90-day suspension is sufficient to impress upon the appellant that the seriousness of her misconduct and that it constitutes the maximum reason penalty for sustained misconduct. And this is a situation where they remanded down from termination and it was in actions where it was far more egregious than what my client actually had. Now, again, this is not the same hospital, not the same department, but it shows that there is an option to reduce the penalty, even though the deciding official says he may not have the same confidence in the employee. And that's just one of the cases that we've shown. There's two others that are discussed at length in the briefs by both parties. There's Reynolds, which is 75 Merit System Protection Board 509, and this one actually the court ruled the penalty did not meet, and it was again a penalty of removal, did not meet the reasonableness of the charge involved. And I believe it's pronounced Yamu, it's I-Y-A-M-U, which is 2006 Merit System Protection Board Lexus 710. And in this case, it was a sexual relationship off the grounds of the hospital where in fact the patient and the employee ended up getting married. And she was actually just reprimanded and got a suspension, and the suspension was upheld as opposed to termination. But again, Yamu was the one where they met off the premises and had a friendship relationship where she was taking him to basketball games and whatnot. Reynolds was the one where they met and they had a sexual relationship and they ended up getting married. But in both cases you have instances that were beyond what my client was actually charged with. And the government will make an issue about the fact that she did not say that the, she's not denying that her actions were inappropriate. She does agree that it is inappropriate for her to email this patient. But again, the fact is the penalty does not meet what she did. It doesn't fit. And we look at just what has been stipulated about these facts. The government will, I'm sure, discuss on their time. But there was no sexual intercourse. There was no off-site relationship. They never met off the hospital grounds. And as they harp on repeatedly in Reynolds, no harm befell the patient. In fact, his case manager even testified at trial that he seemed to be doing fine at that point and that nothing from Ms. Denson's conduct ever seemed to harm him in any way. And so as we see, these are three cases, three cases with far worse conduct than my client was charged with engaging in. But all of them were suspension level and none were terminations. Well, under our standard of review, counsel, exactly what is it that you think the board did that we would reverse it on? How do you, I mean, what part of our standard of review do you think your case meets? Well, I believe it goes to show the just absolute arbitrary nature of reviewing these penalties and that you have just this wide range of conduct and an even wider range of what penalty goes with it. And, you know, as you have with my client, who did not do near with these other reported cases, which is all I have to go on, of other similar types of conduct, there were much worse who got less penalty. And it just, I feel like it shows it's just completely arbitrary nature of the penalty process we have here. Do you think the penalty process generally is arbitrary or in this particular case? Do you want to save your time for rebuttal? Yes, Your Honor. Thank you. Mr. Gintzer. Thank you, Your Honor. May it please the court. I'd like to pick up where my colleague at the bar sort of ended with the issue of harm. In their brief, and again at the podium, they say that there was no harm here, and that's something that should be considered. I think that the fact that they continue to say that there was no harm reflects what Mr. Baltz said was the petitioner's failure to appreciate the seriousness. While it's true that the veteran didn't take, you know, try to kill himself or actually injure himself, there was harm here. In the MSPB, in the administrative judge's decision, he noted that the veteran said that he had been frightened by the actions. He left the nursing home. He had been staying at a nursing home, and in his testimony that's in the record, at A89 and 90, he said that he actually left the nursing home and went back to his parents' house, something he may not have done to get away from the petitioner. And so he said that he was confused and uncomfortable. And so there was harm here, and harm to what we view as one of the more vulnerable people in our society,  points out to three cases which were somewhat similar in nature. And in those three cases, there was only a suspension instead of removal. Does that make any difference as to how the agency uses its discretion from removal to suspension? Should we look at those three cases and make a determination on our own? No, Your Honor, for two reasons, one legal and one factual. The first is that they seem to be making a desperate treatment claim, that, okay, other people were treated differently than their client. That's an affirmative defense which they have to assert and make. Well, I thought Mr. Nichols was simply making the point that the action here was arbitrary based on a comparison with those other decisions, not a desperate treatment case. This is simply a reflection of arbitrary determinations from one case to another. That would be the definition of a desperate treatment. I mean, to say that they're arguing the arbitrariness of it, the definition of a desperate treatment claim would be more or less that, and that is under the law, under the regulations 5 CFR 120156, they have to assert and prove the affirmative defense. But either way, Your Honor, those three- Or you could have cases where an employee in the same position with the same supervisor, same chain of command, et cetera, et cetera, was from one case to another treated differently in terms of the result of a particular personnel action. That's not a desperate treatment issue. That's a question of arbitrariness in the determination. So the two are not the same, that there may be some similarities, but they're different. And I understood Mr. Nichols simply to be saying that those cases, those prior cases, reflect varying applications of the standards, the Douglas factors, and a certain sense of arbitrariness here in the decision. Let me get into those cases then, Your Honor. First, with respect to the Walsh case that he cited, I don't believe that appears in their briefs, so I can't respond to them on the facts of those. It's something that we hadn't seen. You don't have all these cases memorized? I started at A, Your Honor. I haven't gotten to W yet. But with respect to the other two cases that he did cite, which are discussed, there are significant differences. With respect to the Reynolds case, we're dealing with a massage therapist. Obviously, that's a very different position than a social worker. The punishment there was reduced to a 30-day suspension, and the board did that because it sustained only one of three counts. And there was expressed testimony from the person's supervisor that there was no potential for harm to the patient. That's at A129. That puts that in a completely different league than what we're dealing with here, where we had a patient who had been suicidal, and where there clearly was a potential for harm, and there was harm to the patient. Here, we have charges that were sustained that it was an unprofessional, inappropriate conduct. There, it was just a failure to report. And so the charge and the thing that the person did wrong was substantially different. In the Iyamu case, we had a licensed practical nurse, an LPN, who had a relationship with the patient. Here, after the relationship was discovered, the petitioner continued to pursue it. In Iyamu, the supervisor concluded that a suspension was enough to emphasize the seriousness of the action to the petitioner. Here, Mr. Baltz concluded that suspension was not enough, in part because the petitioner did not recognize the seriousness of what she'd done. And I think that continues on to today, and that was considered and adopted by the MSPB. With respect to what the panel asked my colleague regarding confidence, that you've affirmed decisions where it was a question of just a loss of confidence. Confidence here is everything. Here, we have someone whose primary job is to make sure that a veteran, a disabled veteran, and in this case, one who also had post-traumatic stress disorder, that they can get back into society, that they can make the transition to help them out along the way. The boss, Mr. Baltz, the supervisor, Mr. Baltz, has to have confidence that he can trust individuals with the petitioner, and he said that he doesn't have that and that he never would again, that this conduct, this repeated conduct. Keep in mind, Your Honors, this was not a furtive kiss or a reach or anything. It was, over a sustained period of time, a series of decisions to continue to pursue this, even after the petitioner had been told not to by one of the doctors at the hospital. Let's see. With respect to the issue of remorse, Your Honor, remorse is defined by the dictionary as a gnawing distress arising from a sense of guilt for past wrongs. The MSPB found that there was not remorse here, and presumably in part because of the testimony that the petitioner did not take the conduct seriously. In fact, in their closing argument, the petitioner said the following, we agree that some slight misconduct did occur, and that's the problem, that they don't really recognize the severity and the impact of the conduct that did occur. Finally, on the question of mitigation, the petitioner suggested that the family's request was a mitigating factor. Mr. Balt said that whatever the family requested regarding the punishment, it's his responsibility at the hospital to make sure that the veterans get proper treatment and that he had to make the decision that would protect future veterans. And unless the panel has any other questions, we ask that the panel affirm the MSPB's holding that the agency action promotes the efficiency of the service. Thank you, Mr. Chairman. Thank you. Mr. Gillingham, before the government rests, I want to note for the record you've been at the council's table for the last three arguments before us. If any question arises as to your dedication to the government service, we'll be glad to attest to it. Thank you, Your Honor. It was nice to see you at the University of Houston as well. Mr. Nichols. May it please the court. The counsel opposite started by arguing about the harm that may have felt to the patient. Again, I point to his case manager who said he was doing fine at home, there did not seem to be any harm. He argues about the fact that he left the hospital. There's no evidence to show that he left the hospital because of my client or why he left the hospital. I will concede that it's a possibility that that's why, but that's not why we know that he left the hospital. That's not showing the harm that fell him. And he argues about the fact that he was a vulnerable patient. I would point to the Walsh case again and note that the court pointed out that he was actually trying to find the particular site. In the Walsh case, the court noted that he was a recovering alcoholic and that he was also a vulnerable adult and in the same situation. And they reviewed that and again they found that the conduct did not meet determination and that should only result in her having a 90-day suspension. And also similar to this one, there was no self-reporting as my client did to our doctor. The thing to notice in Walsh, the wife of the patient actually reported it to the hospital when she discovered that her husband was having an affair that lasted 18 months with one of her caregivers. Now as you're bringing up the disparate treatment argument, and if you remove our reply before we state, we're not arguing disparate treatment because as the government noted, to do that you have to show again that it's somebody in the same hospital, same job, same classifications. That's not what we're trying to argue. It was as you're saying, we're just trying to show the complete arbitrary nature, showing the wide range of conduct and even wider range of penalties that go with worse conduct than my client was guilty of. And he makes a note about referring to it as slight misconduct. That was actually my closing argument. And the issue there was we're not denying that Ms. Denson didn't do something wrong. What we're arguing is in comparison to Walsh, Yamu, and Reynolds, her actions were not as wrong or rise to that level as those three women did. And finally, point again to something that all three cases noted. If you go to Reynolds, in their final determination, they note the appellant has almost 18 years of satisfactory service with the agency. In Yamu, they note, due to the appellant's long record of excellent service with the agency, and then again in Walsh, despite the seriousness of the appellant's misconduct, she has over 17 years of service with the agency. My client had nearly 18 years of service with the VA. If you read her Douglas factors, they'll note to you that says that her performance was rated as fully satisfactory or better the entire time she was there. And finally, he brings up the supervisor, Mr. Balts, having confidence in Ms. Denson. But first, Mr. Balts is not even at the hospital anymore. He actually retired, I believe, around two years ago, or about two weeks after making the final determination. I don't know the exact date, but roughly around right after he made the final determination on Ms. Denson's case. And he refers to the mitigating factors that Mr. Balts noted. In Balts' testimony, he said the mitigating factors he felt didn't apply because this wasn't about how good of a job she did at the hospital. This was about her conduct with the patient. If you review the Douglas factors, they show that she was an excellent employee and did 18 years worth of excellent service for the VA. Thank you, Your Honor. Thank you. All rise.